THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NOAH BASKETT and REBECCA BASKETT,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY,<br><br>　　　　　Defendant. | CASE NO. C15-1317-JCC<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S AND PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |

　　　　This matter comes before the Court on Defendant Country Mutual Insurance Company's motion for summary judgment (Dkt. No. 21) and Plaintiffs Noah and Rebecca Baskett's motion for partial summary judgment (Dkt. No. 20). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motions in part and DENIES the motions in part for the reasons explained herein.

**I.　　BACKGROUND**

　　　　In July 2014, Noah and Rebecca Baskett lived at 702 Upper Park Street, Tacoma, Washington. (Dkt. No. 1-3 at ¶¶ 1.1, 3.2.) Defendant Country Mutual Insurance Company insured the Basketts' home and the insurance policy (the Policy) included coverage for fire damage to the property. (*Id.* at ¶ 3.2; Dkt. No. 22-2.) On July 24, 2014, an accidental fire damaged the Basketts' home. (Dkt. No. 1-3 at ¶ 3.3; Dkt. No. 20 at 17.) Plaintiffs submitted a

claim to Defendant for the damage. (Dkt. No. 1-3 at ¶ 3.4; Dkt. No. 20 at 17.)

A.   Ms. Reed's Statements

Country Mutual adjuster, Robyn Reed, went to Plaintiffs' home and hired restoration contractor, MaxCare, to estimate the cost of repairing the house. (Dkt. No. 20 at 46.) MaxCare estimated that the full cost of repairs would be approximately $269,000. (*Id.* at 4.)[1] Plaintiffs allege that the Policy entitled them to "about $251,000 plus $19,650 for code compliance." (*Id.* at 5.) Therefore, Plaintiffs claim, MaxCare's estimate of the cost of repairs exceeded the alleged policy limit. (*Id.* at 18, 70.) Plaintiffs allege that Defendant unintentionally failed to include the cost of paying sales tax in the cost of repairs, and this created the shortfall in the Policy coverage. (Dkt. No. 20 at 5) (citing Dkt. No. 20 at 35–36). Defendant contends that "there was no certainty as to what the precise limits of liability were because further calculations needed to be conducted and because no actual repair or replacement took place." (Dkt. No. 25 at 4.)

After her meeting with Mr. Baskett, Ms. Reed also provided Plaintiffs, via email, with a copy of the Policy, a list of alternative contractors, and a summary of the Policy coverage. (Dkt. No. 22-8.) However, Plaintiffs allege that Ms. Reed "unreasonably warned Mr. Baskett not to hire a public adjuster and unreasonably described the damage during a meeting and inspection of the house." (Dkt. No. 22-3 at 2.) Mr. Baskett testified, though, that he does not remember the exact wording, but Ms. Reed said something like "be wary of public adjusters" at their meeting at the house and that he "felt pressured at that time . . . to hire MaxCare." (Dkt. No. 22-4 at 9, 12.) Ms. Reed clarified at her deposition that she told Mr. Baskett that Plaintiffs should try to work with Defendant first, prior to hiring a public adjuster, "because [Defendant] like[s] giving customer service to [their] insureds. . . . Oftentimes when public adjusters are involved, the communication goes to the public adjusters as well as to the insured, but [Defendant does not]

---

[1] Plaintiffs cite a missing deposition testimony page for this estimate. However, Defendant does not dispute this figure in its briefing.

1  have control of what the public adjuster is explaining to the insureds." (Dkt. No. 22-6 at 9–10.)
2  Ultimately, Plaintiffs hired a public adjuster that they were referred to by a friend. (Dkt. No. 22-4
3  at 11–12.) Plaintiffs claim Ms. Reed's statements "led them to retain a public adjuster" and the
4  damages they incurred from this hire include the fact that "[t]he public adjuster charged them 10
5  percent of the value of the claim." (Dkt. No. 22-3 at 13.)

      **B.**      **Policy Coverage**

7  Under the Policy, Defendant was required to pay the "actual cash value," defined as "the
8  cost actually and necessarily incurred to repair or replace the damaged property using standard
9  new construction materials of like kind and quality and standard new construction techniques,
10 less depreciation" or "[f]air market value." (Dkt. No. 22-2 at 5.) Once the homeowner incurred
11 the cost of repairing or replacing the damaged property, Defendant was then required to pay the
12 "replacement cost" up to the policy limits. (*Id.* at 19.) Replacement cost is defined as "the cost
13 actually and necessarily incurred to repair or replace the damaged property using standard new
14 construction materials of the kind and quality and standard new construction techniques."  (*Id.*
15 at 7.) The Policy also states that "[i]f a building or structure is rebuilt at a new location,
16 'replacement cost' may not exceed the cost of restoring the property at the original location."
17 (Dkt. No. 22-2 at 33). The difference between the actual cash value and the total replacement
18 cost available under the Policy is known as the "withheld depreciation." (Dkt. No. 20 at 59.)

19 Here, Defendant paid approximately $199,000 for the actual cash value. (Dkt. No. 20
20 at 64.) Plaintiffs allege that because the cost of repair exceeded the alleged policy limit, they felt
21 they "had no choice but to purchase a replacement house that was not brand new." (Dkt. No. 20
22 at 18.) Plaintiffs could not afford a newly constructed house that matched the features of their
23 damaged home and instead purchased a home built in 1921. (*Id.* at 18) Plaintiffs believe this
24 entitles them to the withheld depreciation under the Policy because they allege they satisfied the
25 replacement terms. (*Id.* at 6.) Defendant reviewed the Policy and mailed Plaintiffs a letter, which
26 stated, "you can repair the damaged house, build a new house, or purchase a brand new house in

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S AND PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT
PAGE - 3

order to recover the depreciation. Purchasing a non-newly built home does not qualify." (*Id.* at 135.) Plaintiffs believe that this is an unreasonable interpretation of their Policy and allege that Defendant wrongfully "refused to pay [Plaintiffs] the withheld depreciation amount that was available under the contract" after they purchased their replacement home. (*Id.* at 6.)

### C. Procedural History

Plaintiffs filed this action in King County Superior Court. (Dkt. No. 1-3.) They allege four counts against Defendant: (1) breach of contract, (2) violation of the Washington Consumer Protection Act (CPA), Wash. Rev. Code § 19.86, *et seq.*, (3) bad faith, and (4) violation of the Washington Insurance Fair Conduct Act (IFCA), Wash. Rev. Code. § 48.30.015, *et seq*. (*Id.* at 3.) Plaintiffs allege that Defendant is liable for breach of contract because it failed to pay the withheld depreciation due under the Policy. (Dkt. No. 22-3 at 1.) Plaintiffs further allege that the CPA and IFCA were violated and Defendant acted in bad faith because (1) Defendant "unreasonably refused to pay" the withheld depreciation and (2) Ms. Reed "unreasonably warned Mr. Baskett to not hire a public adjuster and unreasonably described the damage during a meeting and inspection of the house." (*Id.* at 2–4.)

Defendants removed this action to federal court (Dkt. No. 1) and the parties filed motions for summary judgment. (Dkt. Nos. 20 and 21.) Defendant requests that the Court dismiss the entire action. (Dkt. No. 21.) Plaintiffs request partial summary judgment that Defendant breached the contract, the cost of sales tax is included as part of the cost of repairs, and the cost of repairs exceeds the limits of liability for the Policy. (Dkt. No. 20.) Defendant concedes that the Policy provides coverage for sales tax. (Dkt. No. 25 at 4.) Therefore, the Court need not consider this issue any further. Plaintiffs' motion for summary judgment on the issue of the cost of sales tax being included as part of the cost of repairs is GRANTED. Plaintiffs' cost of repairs claim will be considered with the breach of contract claim. Then, the Court will discuss Defendant's motion for summary judgment on the remaining claims.

///

## II. DISCUSSION

### A. Motion for Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn there from in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Where parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135–36 (9th Cir. 2001). However, in this case, the arguments set forth in the parties' summary judgment motions address many of the same issues. The Court will therefore address the motions together.

### B. Breach of Contract

The central dispute between the parties concerns what constitutes a "replacement" under the terms of the Policy and if the Plaintiffs met those requirements. Interpretation of insurance

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S AND PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT
PAGE - 5

policies "is a question of law, in which the policy is construed as a whole and each clause is given force and effect." *Overton v. Consol. Ins. Co.*, 38 P.2d 322, 325 (Wash. 2002) (citing *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1025 (Wash. 1994)). The terms of a policy should be given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (citing *Sears v. Grange Ins. Ass'n*, 111 762 P.2d 1141, 1142 (Wash. 1988)). However, if there is ambiguity,

> extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.

*Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*, 26 P.3d 910, 913–14 (Wash. 2001) (*Panorama*) (quoting *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000), *as amended* (Jan. 16, 2001)). "Undefined terms in an insurance contract must be given their 'plain, ordinary, and popular' meaning" and "[t]o determine the ordinary meaning of an undefined term, our courts look to standard English language dictionaries." *Panorama*, 26 P.3d at 915 (quoting *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (1990)).

Plaintiffs argue that Defendant "breached the contract by refusing to pay the withheld depreciation." (Dkt. No. 20 at 12.) They contend that the applicable Policy provisions state that Defendant will pay replacement costs once the actual repair or replacement is complete. (*Id.*) Plaintiffs argue that purchase of a home built in 1921 constitutes a replacement under the Policy, and purchase of a newly constructed home was not required. (*Id.* at 13.) Defendant does not dispute that actual repair or replacement is a condition precedent to coverage, but argues that Plaintiffs did not meet this condition precedent because a home built in 1921 is not a "new" home, as required under the terms of the Policy. (Dkt. No. 21 at 12; Dkt. No. 25 at 2–3.) Therefore, Defendant argues, the contract was not breached when it refused to pay the withheld

depreciation. (*Id.*) Essentially, Plaintiffs define "new" as a recently bought home and Defendant defines "new" as a recently built home.

The Policy states that the Replacement Cost is the "the cost actually and necessarily incurred to repair or replace the damaged property using standard *new* construction materials of the kind and quality and standard *new* construction techniques." (Dkt. No. 22-2 at 7) (emphasis added). However, the term "new" is not defined in the Policy and is thus ambiguous. The Court must first look to extrinsic evidence regarding the intent of the parties to resolve the ambiguity. Upon evaluation of the extrinsic evidence presented, it appears that Defendant has been more flexible in the past in regards to what is a replacement under the Policy. (Dkt. No. 20 at 60–63.) However, this does not mean that the word "new" does not include a house built in 1921. As Defendant outlines in its reply,

> [f]or example, Plaintiffs' purchased dwelling, built in 1921, would have lathe-and-plaster walls. New construction would utilize sheet rock and/or drywall instead as a *new construction technique*. The cost of lathe-and-plaster, both as a repair and as considered in the market value of a property, is substantially different from the cost of sheet rock and/or drywall.

(Dkt. No. 28 at 3.) Therefore, the term "new" is still ambiguous after looking at extrinsic evidence.

Because extrinsic evidence does not resolve the ambiguity of the term "new," the Court next determines if the ambiguous definition is "fairly susceptible to two different interpretations, both of which are reasonable." *Panorama*, 26 P.3d at 914. Merriam-Webster's Dictionary defines "new" as (1) "not old: recently born, built, or created"; (2) "not used by anyone else previously"; and (3) "recently bought, rented, etc." *New*, Merriam-Webster's Collegiate Dictionary (11th ed. 2009). Defendant's interpretation of "new" could fit into definitions one and two, but Plaintiffs' interpretation of "new" could fit into definition three. The Court concludes that Plaintiffs' interpretation of "new" as a recently bought home and Defendant's interpretation of "new" as a recently built home are both reasonable. As such, the Court must resolve the ambiguity against the drafter-insurer, Defendant, and in favor of the insured, the Basketts. Upon

review of the relevant Policy sections, extrinsic evidence, and the ordinary meaning of the word "new," the Court concludes that the purchase of a house built in 1921 is a replacement under the terms of the Policy. Therefore, the Court concludes that Defendant breached the contract. Plaintiffs' motion for summary judgment on this claim is GRANTED and Defendant's is DENIED.

As for the cost of repairs exceeding the limits of liability for the Policy issue, the Court concludes that there is a dispute of material fact that remains. Plaintiffs have offered their own calculation of the Policy coverage (Dkt. No. 20 at 4, 65–67), and Defendant contends that these figures *may* be correct, but that "there was no certainty as to what the precise limits of liability were because further calculations needed to be conducted and because no actual repair or replacement took place." (Dkt. No. 25 at 4.) Therefore, a dispute remains and Plaintiffs' motion for summary judgment on this issue is DENIED.

### C. Consumer Protection Act

Plaintiffs argue that the alleged unreasonable breach of contract and Ms. Reed's statements are violations of the CPA. (Dkt. No. 27 at 15–18.) In order to recover under the CPA, a plaintiff must prove "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). "Even if incorrect, a reasonable denial of coverage by the insurer is not a violation of the CPA." *Gingrich v. Unigard Sec. Ins.*, 788 P.2d 1096, 1102 (Wash. Ct. App. 1990) (citing *Villella v. Public Employees Mut. Ins. Co.*, 725 P.2d 957, 965 (Wash. 1986)). To prove causation, the "plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007).

#### 1. Breach of Contract

The Court concluded above that the denial of coverage, although a breach of contract,

was a reasonable interpretation of the Policy based on the disputed definition of "new." Therefore, even if incorrect, the denial of coverage itself is not a violation of the CPA. *See Gingrich*, 788 P.2d at 1102. Plaintiffs allege in their response to Defendant's motion that even if the interpretation was reasonable, Defendant's "mistaken failure to consider sales tax *created* the problem of Plaintiffs being unable to rebuild their house or pay for a brand new house" and was unreasonable. (Dkt. No. 27 at 15–16.) However, this is the first time Plaintiffs have made this argument. It is not contained in their complaint or their responses to discovery requests. Moreover, Plaintiffs have not provided evidence that the failure to consider the sales tax was the but for cause of their alleged injury as required to sustain a CPA claim. *See Indoor Billboard/Wash., Inc.*, 170 P.3d at 22. Therefore, Defendant's motion for summary judgment on the CPA claim for unreasonable denial of coverage is GRANTED.

2.   <u>Ms. Reed's statements</u>

For purposes of this Order, the Court assumes without deciding that Plaintiffs have established all but injury and causation with regards to Ms. Reed's statements. Plaintiffs claim Ms. Reed's statements "led them to retain a public adjuster" and the damages they incurred from these statements include the fact that "[t]he public adjuster charged them 10 percent of the value of the claim." (Dkt. No. 22-3.) However they also claim that Ms. Reed "unreasonably warned Mr. Baskett not to hire a public adjuster and unreasonably described the damage during a meeting and inspection of the house." (Dkt. No. 22-3 at 2.) These allegations are confusing. Plaintiffs simultaneously allege that Ms. Reed warned them *not to hire* a public adjuster, but state that their damages come from *hiring* a public adjuster. Moreover, Plaintiffs were referred to a public adjuster by a friend. (Dkt. No. 22-4 at 11.) As such, Plaintiffs have not proved that but for Ms. Reed's conduct, they would not have suffered injury. The Court will not presume facts not in the record. *See Lujan*, 497 U.S. at 888–89.  Therefore, Defendant's motion for summary judgment on the CPA claim for Ms. Reed's statements is GRANTED.

///

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S AND PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT
PAGE - 9

### D. Bad Faith

Plaintiffs argue that the alleged unreasonable breach of contract and Ms. Reed's statements are bad faith. (Dkt. No. 27 at 15–18.) Claims of insurer bad faith "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty. In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (citing *Mutual of Enumclaw Ins. Co. v. Dan Paulson Const., Inc.*, 169 P.3d 1, 8 (Wash. 2007)).

#### 1. Breach of Contract

Again, the Court has already concluded above that the denial of coverage was a reasonable interpretation of the Policy. Therefore, Defendant's conduct does not meet the breach requirement of unreasonable conduct. Defendant's motion for summary judgment on the bad faith claim for unreasonable denial of coverage is GRANTED.

#### 2. Ms. Reed's Statements

Although "[w]hether an insurer acted in bad faith is generally a question of fact," *id.*, the Court concludes that Ms. Reed's statements were not bad faith as a matter of law. There was no breach because actions were not unreasonable, frivolous, or unfounded. Ms. Reed cautioned Plaintiffs from hiring a public adjuster in order to expedite the process (Dkt. No. 22-6 at 9–10), but also provided an extensive list of alternative contractors and policy coverage information in response to Mr. Baskett's email. (Dkt. No. 22-8.) Her behavior does not reach the conduct required for bad faith. For the same reasons as above in the CPA claim, Plaintiffs cannot prove that Ms. Reed caused any alleged damages. Therefore, Defendant's motion for summary judgment on the bad faith claim for Ms. Reed's statements is GRANTED.

### E. Insurance Fair Conduct Act

Plaintiffs argue that the alleged unreasonable breach of contract and Ms. Reed's statements are violations of IFCA. (Dkt. No. 27 at 15–18.) IFCA allows an insured who is

"unreasonably denied a claim for coverage or payment of benefits by an insurer [to] bring an action in the superior court of this state to recover the actual damages sustained." Wash. Rev. Code § 48.30.015.

### 1. Breach of Contract

The Court concluded above that the denial of coverage was a reasonable interpretation of the Policy. Therefore, Defendant's conduct does not meet the IFCA requirement of unreasonable conduct. Defendant's motion for summary judgment on the IFCA claim for unreasonable denial of coverage is GRANTED.

### 2. Ms. Reed's Statements

By the terms of the IFCA, only unreasonable denial of coverage is actionable. Therefore, the statements made by Ms. Reed are not actionable and Defendant's motion for summary judgment on the IFCA claim for Ms. Reed's statements is GRANTED.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 21) is GRANTED in part and DENIED in part. Plaintiffs' motion for partial summary judgment (Dkt. No. 20) is GRANTED in part and DENIED in part. The Court concludes Defendant breached the contract and the cost of sales tax is included as part of the cost of repairs. However, the withheld depreciation value and whether the cost of repairs exceeded the limits of liability for the Policy remain in dispute. The Court also concludes that the remaining claims, violation of the CPA, bad faith, and violation of IFCA, are dismissed in their entirety.

///

///

///

///

///

///

1    DATED this 18th day of November 2016.

*[signature]*

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S AND PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT
PAGE - 12